1

2

3

4

5

6

7

8                        UNITED STATES DISTRICT COURT

9                        EASTERN DISTRICT OF CALIFORNIA

10   SHELLEY PROOF,                          No.  2:12-cv-01716-TLN-CKD

11              Plaintiff,

12        v.                                 **FINDINGS OF FACT AND
                                             CONCLUSIONS OF LAW**
13   INTEL CORPORATION LONG TERM
     DISABILITY PLAN,
14
                Defendant.
15

16

17

18        This action arises out of Defendant Intel Corporation Long Term Disability Plan's

19   ("Defendant" or "Plan") termination of Plaintiff Shelley Proof's ("Plaintiff") long-term disability

20   ("LTD") benefits.  This motion is before the Court on Plaintiff's Motion for Judgment Pursuant to

21   Rule 52[1] (ECF No. 20) and Defendant's Cross-motion for Judgment pursuant to Rule 52 (ECF

22   No. 21).[2]  Each party opposes the other's motion.  (ECF Nos. 24, 25.)  The Court has carefully

23   considered the parties' arguments, and hereby DENIES Plaintiff's Motion for Judgment (ECF

24   No. 20) and GRANTS Defendant's Motion for Judgment Pursuant to Rule 52 (ECF No. 21).

25   ///

26

27

28

---

[1]   All references to the "Rules" refer to the Federal Rules of Civil Procedures unless otherwise specified.
[2]   This matter was submitted on the briefs pursuant to Local Rule 230(g).

1

I.      **FINDINGS OF FACT[3]**

A.      <u>**Plaintiff's Claim for LTD Benefits**</u>

1.      Plaintiff began working for Intel in 2000.  (AR 1503.)

2.      Plaintiff's most recent position job title was IT/Project Manager.  (AR 1503.)

3.      The IT/Project Manager job description, per the Aetna Job Analysis Worksheet, is as follows:

> The IT Project/Program Manager assists with the management of projects and programs through the various phases of the lifecycle. The manager may also function as the team lead for key organizational initiatives (e.g., project administration and logistics) of local projects.  Local projects are typically limited to a single geography with duration of less than six months.  [Plaintiff] was required to work eight (8) hour days, five (5) days a week without overtime.

(AR 21.)

4.      Plaintiff's job duties included frequent lifting/carrying up to 10 pounds, seldom pushing and pulling or reaching.  The job required seven (7) hours of sitting as well as one-half hour walking and one-half hour climbing stairs.  The job involved six (6) hours of keyboarding and using a mouse, six (6) hours working around others and two (2) hours working with others.  (AR 21.)

5.      Plaintiff stopped working in 2008 due to her alleged disability.  (AR 1503.)

6.      Plaintiff applied for short term disability ("STD") benefits under Intel's STD benefit plan.

7.      Her STD claim was approved and paid in full.[4]

8.      At the conclusion of her STD benefit period, Plaintiff submitted her claim for LTD benefits to Aetna Life Insurance Company ("Aetna"), who administered the LTD Plan at

---

[3]      The majority of the facts described herein are derived from the administrative record ("AR") submitted by the parties.  The facts are undisputed except where noted by the Court.  Both parties refer to certain events within their briefing and at times fail to supply the Court with an appropriate AR citation.  Thus, where the parties both agree as to an event but fail to supply a citation, the Court takes the parties' agreement as fact and does not provide a citation.

[4]      Both parties agree that the plan was paid in full.  However, the page cited within the record in support of this assertion (AR 1448) is merely a copy of Intl's Long Term Disability Plan, and thus does not support this statement.

2

the time.   Under the "Duties You Now Cannot Perform" section in the benefits request form, Plaintiff wrote: "[d]ue to the nausea, vomiting, and weakness attributed to my disability, I am no longer able to perform any job duties."  (AR 1727.)

9.      Plaintiff's medical records indicated that Plaintiff had a history of diabetic gastroparesis[5] with worsening nausea.  Her gastroenterologist, Dr. Mark W. Redor, diagnosed Plaintiff with "severe diabetic gastroparesis–unresponsive to multiple modalities" in March 2008. (AR 1667.)

10.      Dr. Redor referred [Plaintiff] to the Motility Center at the University of California at Davis, (AR 1668) but Plaintiff continued to have "major symptoms," including daily nausea and vomiting.  In May 2008, Dr. Redor also diagnosed Plaintiff with anemia.  (AR 1682.)

11.      Dr. Redor's records also indicated that in May of 2008, Dr. Redor performed an esophagogastroduodenoscopy[6] on Plaintiff.  This procedure found "retained fluid in the stomach, consistent with a diagnosis of gastroparesis[.]"  (AR 1685–86.)

12.      Dr. Redor subsequently referred Plaintiff to UC Davis for evaluation utilizing a gastric stimulator.  (AR 1690.)

13.      The records of Dr. Del Zotto, Plaintiff's podiatrist, confirmed Plaintiff's history of diabetes, and resulting chronic neuropathic pain in her foot.  Dr. Zotto's October 29, 2008 entry explained that Plaintiff suffered from "progressive disabling secondary problems of diabetes, including progressive neuropathic pain and insensate changes to various aspects of each foot and suspected arthritic pain. . . . She has had a history of ulceration and she has had at least one hospitalization due to infection."  (AR 1648.)

14.      Plaintiff's LTD claim was denied on November 19, 2008 because Aetna found that she had provided insufficient medical records and thus there were "no objective medical findings to substantiate [her] inability to perform [her] own occupation as of 1/1/2009."

---

[5]      Gastroparesis is a digestive disorder wherein the gastric system does not empty food properly.  *See* Gastroparesis Overview: Causes & Symptoms, http://www.webmd.com/digestive-disorders/digestive-disorders-gastroparesis (last visited Sept. 5, 2014).

[6]      Esophagogastroduodenoscopy (EGD) is a test that utilizes an endoscope to examine the lining of the esophagus, stomach, and first part of the small intestine.  *See* Digestive Problems and Endoscopy, http://www.webmd.com/digestive-disorders/upper-endoscopy (last visited Sept. 5, 2014).

1   (AR 1855–56.)

2          15.     After filing an appeal with the Plan (AR 1484) to no avail, Plaintiff

3   initiated suit in this Court.  *See Proof v. Intel Corp. Long Term Disability Plan*, E.D. Cal., Case

4   No. 09-CV-02237-GEB-DAD.

5          **B.      Plaintiff's Social Security Adminstration ("SSA") Determination**

6          1.     On September 30, 2008, Plaintiff filed for disability with the Social

7   Security Administration ("SSA").  (AR 647.)

8          2.     Plaintiff's primary diagnosis was diabetes mellitus, but also included

9   diabetic gastroparesis, diabetics neuropathy, diabetic retinopathy, diabetic nephropathy, chronic

10  fatigue, exertional dyspnea, morbid obesity, hypertension, mild anemia and hyperlipidemia.[7]  (AR

11  647–48.)

12         3.     In order to qualify for diability benefits from SSA a person must be unable

13  "to engage in any substantial gainful activity by reason of any medically determinable physical or

14  mental impairment which can be expected to result in death or which has lasted or can be

15  expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).

16  Plaintiff was awarded benefits from the SSA beginning in December 2008.  (AR 1485–86.)

17         **C.      *Proof v. Intel Corp. LTD Plan***

18         1.     *Proof v. Intel Corp. LTD Plan* was originally before the Honorable Garland

19  E. Burrell.  On April 15, 2010, the Plan filed a motion for summary judgment.  The Court denied

20  the Plan's motion, finding that the Plan had abused its discretion in two ways when denying

21  Plaintiff's claim for benefits.  First, the Court found that the Plan had misinterpreted the definition

22  of disability by requiring Plaintiff to provide objective evidence of her inability to work.  (AR

23  58.)  Second, the Court found that "Defendant did not explain why Plaintiff's symptoms were

24  insufficient to qualify her for LTD benefits."  (AR 59.)

25         2.     Based on these findings, on August 11, 2010, Judge Burrell determined

26  that the Plan abused its discretion in denying Plaintiff's claim for benefits and remanded her

27

28  [7]     Because only the diagnosis of  gastroparesis is relevant to its decision, the Court declines to comment on or define these medical conditions.

4

1   claim to the Plan for redetermination.  (AR 60–61.)

2          D.      <u>Post-remand Timeline of Events</u>

3                  1.      Plaintiff's LTD Plan has two separate periods of disability, the "Own

4   Occupation Period" (which encompasses the first 18 months of Disability), and the "Any

5   Occupation Period" (which starts in the 19th month of Disability).  (AR 1448–49.)  On remand,

6   the claims administrator reinstated Plaintiff's LTD benefits and paid Plaintiff through May 16,

7   2011, which marked the end of the "Own Occupation Period."  (AR 858.)

8                  2.      The benefits were terminated thereafter by the Reed Group (the Plan's new

9   claim adjustor) on the grounds that Plaintiff did not meet the requirement for "Disability" as

10  stated in the LTD Plan.  (AR 858.)

11                 3.      Plaintiff appealed the decision to terminate her LTD benefits and on

12  January 4, 2012, the decision was upheld on first reconsideration.  (AR 772.)

13                 4.      Plaintiff filed a second-level (voluntary) appeal, and on June 6, 2012, the

14  decision to terminate Plaintiff's LTD benefits was again upheld on second reconsideration (this

15  time, by Claim Appeal Fiduciary Services, Inc. ("CAFS"), the Plan's independent appeal

16  fiduciary).[8]  (AR 1-19.)

17                 5.      This lawsuit followed.

18         E.      <u>Defendant's Post-Remand Medical and Occupational Assessments[9]</u>

19                 1.      In making the determination that Plaintiff is not disabled within the LTD

20  Plan, Defendant relied on the following medical findings:[10]

21                 2.      Plaintiff has carried a diagnosis of diabetes since at least age 16.  (AR 509–

22  14.)  Plaintiff has received care and treatment for her diabetes from Dr. Henry Schwartz, M.D.

23  (*see* AR 501–08; AR 514), Dr. Geetha Pingili, M.D. (*see* AR 226–35; AR 253; AR 260–63; AR

24  _____

25  [8]      *See* Section I(F) *infra* for a more detailed discussion of CAFS's denial letter.
    [9]      This section details the information that Defendant alleges it relied on in determining that Plaintiff did not
26  meet the Plan's definition of disabled.  (*See* Defs. Trial Brief, ECF No. 21 at 4–10.)
    [10]     Defendant includes various medical findings from 2008 in its briefing.  The Court does not include this
27  information in this Order because one of CAFS's primary arguments as to why Plaintiff no longer qualifies as
    disabled under the plan is that Plaintiff's diagnosis changed after Judge Burrell's 2010 Order remanding this case.
28  (*See* ECF No. 15–17.)  As such, medical findings that were made two years prior to Judge Burrell's Order are
    irrelevant.

569–72; AR 588–93; AR 595–600), and Eloise C. Diebel, RD (*see* AR 112–15).

4.      On December 30, 2010, Dr. Walter Zajac, MD evaluated Plaintiff for alleged gastroparesis syndrome.  In his report, Dr. Zajac stated the following:

> Patient seen, examined, and chart reviewed.  HPI: patient has a hx of Dm with complications since age 16. She has been diagnosed at an outside facility with gastroparesis and had egd; gastric emptying studies; was evaluated at UCD and told she was a candidate [sic] for gastric pacemaker but changed insurance and did not get it done. She has tried Reglan; [D]omperidone; without any help.  She does note some help with Zofran; not with [C]ompazine; nor [T]ygan.  She has been seen by nutrition; tries to follow multiple frequent low residue meals.  She usually uses [G]ucerma during the day and then has a "heavy meal at night[.]"  [S]he has gained weight.  We spent more than 50% of time on councilling [sic] and more than 30 min in discussion; we discussed egd; gastric emptying studies; she does not wish to repeat as further evaluation for pace maker and nausea.  We discussed nutrition consult and role of diet; she does not wish to have nutrition conatct [sic] her.  We discussed gastric pacemaker; and evaluation here To consider sending outside for possible plscement [sic].  She does not wish to consider (she has done "a lot" of intermittant [sic] research and does not wish to persue [sic]) we discussed low residue meals very often rather than the one heavy meal in the evening is in all prob. aggarvating [sic] the nausea [sic].  She does not wish to consider changing; we discussed weight gain as an indicater [sic] of excess calorie intake rather than lack of nutrition.  We discussed the placement of a jejunal feeding tube to bypass the stomach and maintain nutrition with min. [n]ausea.  She does not want to consider but does state she wants to think about it.  She has tried Botox and "[i]t did not work" even the first time[.]"  She does not wish to consider trying it again.

(AR 529.)

5.      On March 1, 2011, Michael Lawson, MD evaluated Plaintiff for difficulty swallowing; she was requesting a second opinion regarding her presumed gastroparesis.  Dr. Lawson's assessment indicated that Plaintiff's symptoms were not entirely related to gastroparesis and appeared more consistent with non-ulcer dyspepsia and irritable bowel syndrome, with somatic complaints as co-morbidities.  He discussed the condition with Plaintiff as well as the contributing factor of stress.  Dr. Lawson referred Plaintiff to behavior medicine and advised increased exercise as tolerated.  (AR 539–44.)

6.      On October 11, 2010, Heartland Therapy Provider Network ("HTPN") conducted a functional capacity evaluation ("FCE").  (AR 793.)  The evaluator commented that

Plaintiff "appears to have significant physiological distress from her abdominal symptoms which completely overshadow her low back complaints."  The evaluator noted that Plaintiff stated "that she has no definitive diagnosis or education regarding her abdominal symptoms and complaints," and further that Plaintiff "appear[ed] to have given her best effort and/or she has significant anxiety as evidenced by the very high working heart rates compared to her resting heart rates."  The evaluator stated that Plaintiff's "credibility is good as her [ ] hand strength tests were valid and reliable."  (AR 800.)

7.      The evaluator classified Plaintiff as an individual with light physical demand classification ("PDC").  Thus, the evaluator opined that Plaintiff could occasionally lift between 16–20 lbs., frequently lift 8–10 lbs, and consistently lift 3–4 lbs.  (AR 800.)  However, the report noted that lifts over five times a day at these levels would place Plaintiff in significant medical risk.  (AR 800.)

8.      On May 2, 2011, Dr. Tomas E. Leonard, M.D. (Internal Medicine and Cardiology) performed a physical exam on Plaintiff.  (AR 780–90.)  Dr. Leonard noted that Plaintiff was markedly obese with a blood pressure of 110/70, weight of 258 pounds, pulse of 74, and respirations of 20.  (AR 787.)

9.      Dr. Leonard's assessment included chronic exogenous obesity, diabetes with multiple complications, and mild gastroparesis.  (AR 788.)

10.      Dr. Leonard stated "[t]here is no question that this patient suffers diabetes; there is no question that she suffers an element of gastroparesis.  It is best considered mild to moderate.  Her major complaint, however, is not vomiting, it is nausea."  (AR 788.)

11.      Dr. Leonard opined that patients that have significant gastroparesis lose weight and thus because Plaintiff was not losing weight she would be categorized as having mild gastroparesis.  (AR 788–89.)  Dr. Leonard stated that although there was no objective data to support Plaintiff's nausea and vomiting that "there is objective data that she has gastroparesis." (AR 788.)

12.      Dr. Leonard concluded:

it is well recognized that [Plaintiff's] difficulties as exemplified on

7

> objective studies. scintography, emptying studies, are with solid foods. There is nothing about this problem of having solid food emptying difficulties that would preclude this patient from having liquid breakfast, even liquid lunch, have normal or slightly abnormal emptying of those liquids, and be able to work a full workday. The complaint offered to Dr. Reeder as noted by Dr. Chone on 1/07/09 is that the patient's nausea was inhibiting her ability to concentrate at work. There is no question that there are underlying and/or overwhelming psychological issues given her answers to a questionnaire. The absence of weight loss strongly suggests that the gastric emptying abnormalities are not such that they would inhibit her from continuing to work in her usual capacity, certainly able to work in multiple capacities, but even in her usual capacity as a project manager. I could not agree more with Dr. Chone that this patient is not a candidate for long-term disability.

(AR 789.)

13.    On January 4, 2012, Dr. Gary H. Nudell, MD (Internal Medicine) reviewed Plaintiff's records. Dr. Nudell concluded that Plaintiff's

> main complaint per the records has been ongoing nausea with occasional vomiting, with a diagnosis of gastroparesis. While there has been documentation by a gastric emptying study of mild to moderate gastroparesis, there has been no documentation of any weight loss, and no documentation of any malnourishment. There has been documentation in the records that the claimant can tolerate liquids during the day and one bigger meal at night. While the claimant has subjective complaints of nausea, there has been minimal vomiting.

(AR 775.)

14.    Dr. Nudell concluded that overall, the records did not support complete removal from the workplace based on the diagnosis of gastroparesis and subjective nausea. (AR 775.)

15.    On May 21, 2012, Dr. Kevin Trangle, MD (Occupational and Environmental Internal Medicine) conducted a review of Plaintiff's medical records. (AR 20–41.) Dr. Trangle concluded that "there is no objective medical evidence to substantiate her long-term disability claim based on gastroparesis with chronic nausea. He stated that Plaintiff "should be able to perform other duties in the sedentary to light physical demand category." (AR 40.) In support of his conclusion he states that Plaintiff's "functional capacity evaluation (FCE), transferable skills analysis (TCA), objective physical findings contained in her medical records as

8

well as the observations and opinions of various physician reviewers has provided a plethora of support for this conclusion."  (AR 40.)

### F.    CAFS June 2012 Denial Letter

1.    CAFS was retained by Intel as an independent fiduciary to perform reviews of LTD Plan claim appeal denials.  (AR 01.)

2.    In its June denial letter, CAFS provides a summary of the rationale for denial.  (AR 16.)  In this summary, CAFS states that it "agree[d] with Reed's initial determination, and the determination on first level appeal, that [Plaintiff] no longer has a Disability under the terms of the Plan that would preclude her from performing the duties of her position as a project manager, or of 'any occupation for which [Plaintiff] becomes reasonably qualified for by training, education or experience' as of May 16, 2011."  (AR 16.)  Specifically, CAFS states that "there are no longer objective medical findings to definitively support the diagnosis of gastroparesis with chronic nausea, which has been the basis of [Plaintiff's] claim that she is disabled."  (AR 16–17.)

3.    In support of its conclusion, CAFS cites to Dr. Lawson's opinion that Plaintiff's symptoms were more consistent with non-ulcer dyspepsia and irritable bowel syndrome.  (AR 17.)

4.    CAFS also states that Plaintiff's alleged refusal to follow treatment advice of her providers would be in itself a rationale for discontinuance of LTD benefits under the Plan.  (AR 17.)

5.    Additionally, CAFS addressed its decision in light of the SSA's determination that Plaintiff is disabled:

> With respect to [Plaintiff's] receipt of SSA disability benefits, the Record reveals that [Plaintiff] was notified of the SSA's decision to award her disability benefits, over three years ago.  This was during a period in which Ms. Proof was also determined to be eligible for LTD benefits under the Plan.  The SSA's determination was not made or based upon the same medical evidence utilized in this determination. It does not appear that her award of SSA disability benefits has been reconsidered since that date, because no record of such reconsideration appears in the claim file.  Therefore, the award of SSA disability benefits was not a contemporaneous consideration of [Plaintiff's] condition as of May 16, 2011.

9

(AR 17.)  CAFS's letter also notes that "the definition of disability, and the requirements for continued eligibility under the SSA's program and under the Plan are not the same, and therefore the ultimate results with respect to Plaintiff, are not necessarily the same."  (AR 17.)

6.      Finally, in discussing Judge Burrell's Order and its impact on CAFS's determination, CAFS notes that the most recent medical documentation considered in that case were from November 17, 2009, well before the most recent diagnostic testing and consultations with gastroenterologists.  Thus, CAFS concludes that the Court's Order is not determinative factually of the outcome of Plaintiff's disability status assessment.  (AR 18.)

## II.      CONCLUSIONS OF LAW

### A.      Legal Standard

1.      Federal Rule of Civil Procedure 52(a)(1) provides that "[i]n an action tried on the facts without a jury . . .  the court must find the facts specially and state its conclusions of law separately.  The findings and conclusions may be stated on the record . . . or may appear in an opinion or a memorandum of decision filed by the court.  Judgment must be entered under Rule 58."

2.      This Court has jurisdiction pursuant to the Employment Retirement Income Security Act ("ERISA").  *Clorox Co. v. U.S. Dist. Court for N. Dist. of Cal.*, 779 F.2d 517, 521 (9th Cir. 1985) ("ERISA creates a federal cause of action, with concurrent state and federal jurisdiction, over claims by an employee 'to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan.'") (quoting 29 U.S.C. § 1132(a)(1)).

3.      "ERISA represents a careful balancing between ensuring fair and prompt enforcement of rights under a plan and the encouragement of the creation of such plans." *Conkright v. Frommert*, 559 U.S. 506, 517 (2010) (internal citations and quotation marks omitted).  "Congress enacted ERISA to ensure that employees would receive the benefits they had earned, but Congress did not require employers to establish benefit plans in the first place." *Id.* at 516–17 (citing *Lockheed Corp. v. Spink*, 517 U.S. 882, 887 (1996)).

1        4.       The parties agree that the long-term disability plan at issue in this case is an

2   "employee welfare benefit plan" subject to ERISA (AR 18–19).  *See* 29 U.S.C. § 1002(1)

3   (defining "employee welfare benefit plan" and "welfare plan" to include "any plan, fund, or

4   program . . . established or maintained by an employer or by an employee organization, or by

5   both, to the extent that such plan, fund, or program was established or is maintained for the

6   purpose of providing for its participants or their beneficiaries, through the purchase of insurance

7   or otherwise[] . . . benefits in the event of sickness, accident, disability, death or unemployment").

8        5.       When a benefit plan gives the administrator discretionary authority to

9   determine eligibility for benefits or to construe the terms of the plan, the Court reviews the

10   administrator's decision for abuse of discretion.  *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S.

11   101, 115 (1989); *Montour v. Hartford Life & Accident Ins. Co.*, 588 F.3d 623, 629–30 (9th Cir.

12   2009); *Saffon v. Wells Fargo & Co. Long Term Disability Plan*, 522 F.3d 863, 866 (9th Cir.

13   2008).

14        6.       Because the parties agree that the policy provides Defendant with

15   discretion to interpret the policy, the abuse of discretion standard applies here.

16        7.       "In the absence of a conflict, judicial review of a plan administrator's

17   benefits determination involves a straightforward application of the abuse of discretion standard."

18   *Montour*, 588 F.3d at 629.  "In these circumstances, the plan administrator's decision can be

19   upheld if it is 'grounded on *any* reasonable basis.'"  *Id*. (quoting *Sznewajas v. U.S. Bancorp Am. &*

20   *Restated Supp. Benefits Plan*, 572 F.3d. 727, 734–35 (9th Cir. 2009)); *see also Conkright*, 559

21   U.S. at 521 ("Applying a deferential standard of review . . . means only that the plan

22   administrator's interpretation of the plan 'will not be disturbed if reasonable.'") (quoting

23   *Firestone*, 489 U.S. at 111).

24        8.       "[W]here there is no risk of bias on the part of the administrator, the

25   existence of a 'single persuasive medical opinion' supporting the administrator's decision can be

26   sufficient to affirm, so long as the administrator does not construe the language of the plan

27   unreasonably or render its decision without explanation.  *Montour*, 588 F.3d at 630 (citing *Boyd*

28   *v. Bert Bell/Pete Rozelle NFL Players Ret. Plan*, 410 F.3d 1173, 1179 (9th Cir. 2005.))  "[A]

1    mere tally of experts is insufficient to demonstrate that an ERISA fiduciary has abused its

2    discretion, for even a single persuasive medical opinion may constitute substantial evidence upon

3    which a plan administrator may rely in adjudicating a claim." *Boyd*, 410 F.3d at 1179.

4          9.     "Other factors that frequently arise in the ERISA context include the

5    quality and quantity of the medical evidence, whether the plan administrator subjected the

6    claimant to an in-person medical evaluation or relied instead on paper review of the claimant's

7    existing medical records, whether the administrator provided its independent experts 'with all of

8    the relevant evidence[,]' and whether the administrator considered a contrary [Social Security

9    Administration] disability determination, if any." *Montour*, 588 F.3d at 630 (citing *Glenn*, 554

10   U.S. at 105 *and Saffon*, 522 F.3d at 869–73).

11                          **III.     ANALYSIS**

12         As discussed above, Judge Burrell's previous order discussed the two-prong approach to

13   determining whether a claimant meets the standard for disability under the LTD Plan.  First, a

14   claimant must show that she has an illness or injury substantiated by objective medical findings.

15   (AR 58.)  Second, the claimant must show that the illness or injury renders her incapable of

16   performing work.  (AR 58.)  In reviewing CAFS's denial of Plaintiff's disability claim, the Court

17   finds CAFS's contention that Plaintiff is no longer disabled under the first prong to be

18   unreasonable.  However, because the Court finds that CAFS's determination under the second

19   prong—that Plaintiff is not incapable of performing any occupation—is supported by  the

20   administrative record, the Court finds that Plaintiff is not entitled to benefits under the LTD Plan.

21         At the outset, the Court notes that CAFS's denial letter conflates the two prongs within the

22   Plan's disability determination.  For example, CAFS's letter stated that it:

23             agree[d] with Reed's initial determination, and the determination on
               first level appeal, that [Plaintiff] no longer has a Disability under
24             the terms of the Plan that would preclude her from performing the
               duties of her position as a project manager, or of 'any occupation
25             for which you become reasonably qualified for by training,
               education or experience' as of May 16, 2011.
26

27   (AR 16.)  This statement fails to specifically convey which prong the decision is made under and

28   suggests that CAFS determined that Plaintiff failed to meet either of the prongs.  This

1  interpretation is supported by CAFS's statement that there are no medical findings to definitively

2  support the diagnosis of gastreoparesis with chronic nausea, as well as its statement that

3  
4  
5  
6  
7
> all independent examining physicians and physician record reviewers agree that the medical evidence supports the conclusion that [Plaintiff] is capable of sedentary work.  Notably, [Plaintiff's] own treating physicians offer no statements regarding her current functional capacity as disabling.  In addition, we note that Dr. Trangle's assessment was done on a co-morbid basis, taking into account all conditions with which [Plaintiff] has been diagnosed, and the impact of prescribed medication.

8  (AR 16–17.)  The Court addresses each prong separately.

9      **A.**    **<u>Plaintiff's Disability</u>**

10      In CAFS's denial letter it states:

11  
12  
13  
14  
15  
16
> [a]s most clearly documented by Dr. Trangle, there are no longer objective medical findings to definitively support the diagnosis of gastroparesis with chronic nausea, which has been the basis of [Plaintiff's] claim that she is disabled. For example, Michael Lawson, M.D., a gastroenterologist with whom [Plaintiff] consulted in early 2011 opined that her symptoms were more consistent with non-ulcer dyspepsia and irritable bowel syndrome.  In addition, the objective medical findings that would be expected in the presence of gastroparesis with chronic nausea, including weight loss, dehydration, iron study abnormalities, electrolyte abnormalities or malnutrition, are absent.

17  (AR 16–17.)  The Court has reviewed Dr. Trangles's report and agrees that Dr. Trangle opined

18  that there could be explanations other than gastroparsis for Plaintiff's symptoms.  However, the

19  Court finds that CAFS mischaracterizes Dr. Tangle's report as calling into question whether

20  Plaintiff has gastroparesis.

21      The Court cannot find anything in Dr. Tangle's report that would support CAFS's

22  determination that there is no objective medical evidence that Plaintiff has gastroparesis.  While

23  Dr. Tangle's report states that **there is no objective medical evidence that substantiates a long-**

24  **term disability**, this statement is made in conjunction with his finding that Plaintiff is capable of

25  work.  "[T]here is no objective medical evidence to substantiate her long-term disability claim

26  based on gastroparesis with chronic nausea.  The objective evidence is consistent with her

27  continued ability to not only perform the regular duties of her own occupation, but she should be

28  able to perform other duties in the sedentary to light physical demand category."  (AR 40.)  This

13

1    statement does not support CAFS's statement that Plaintiff no longer is disabled within the first

2    prong of the analysis.  In fact, in his report Dr. Tangle states as follows: "[i]n regards to her

3    primary complaint of nausea and occasional vomiting, **the objective medical evidence supports**

4    **the diagnosis of mild diabetic gastroparesis**.  This is primarily based on her gastric emptying

5    study from 05/08/2008 which showed delayed gastric emptying with a mild to moderate response

6    to intravenous Reglan administration."  (AR 38 (emphasis added).)   Dr. Tangle does mention that

7    Dr. Lawson opined that Plaintiff's symptoms "were more consistent with non-ulcer dyspepsia and

8    irritable bowel syndrome with somatic complaints as co-morbidities." (AR 39.)  However, Dr.

9    Tangle does not conclude that Plaintiff does not suffer from gastroparesis.  In fact, Dr. Tangle

10   states the opposite.  "In addition, several of the reviewing physicians have pointed out that

11   although she has been diagnosed with osteoarthritis of various joints, no real objective findings or

12   imaging study results have substantiated such a diagnosis; therefore, these medications should be

13   weaned **as they are likely contributing to her gastroparesis and other gastrointestinal**

14   **complaints**." (AR 39.)

15         Furthermore, to the extent that Defendant relies on Dr. Lawson's opinion, such reliance is

16   also unwarranted.  Dr. Lawson's report does not state that Plaintiff does not have gastreoparesis.

17   Instead, Dr. Lawson merely states that "symptoms cannot all be attributed to gastreoparesis and

18   are more consistent with non-ulcer dyspepsia and irritable bowel syndrome with somatic

19   complaints as co-morbidities." (AR 543.)  The Court does not find that this one statement

20   undermines the objective evidence that supports that Plaintiff suffers from gastroparesis.  (*See* AR

21   637 (Gastric Emptying Report); AR 529 (On December 30, 2010, Dr. Walter Zajac diagnosed

22   Plaintiff with gastroparesis.); AR 788 (On May 2, 2011, Dr. Leonard found there was objective

23   data that Plaintiff suffers from gastroparesis.); AR 775 (On January 4, 2012, Dr. Nudell issued a

24   report which stated that Plaintiff suffers from mild to moderate gastroparesis.).)  As such, the

25   Court finds that CAFS's determination that Plaintiff does not meet the first prong is unreasonable

26   and not supported by the Administrative Record.

27         **B.      Plaintiff's Capability of Work**

28         CAFS's denial letter states that Plaintiff's request for LTD benefits is denied because she

                                                    14

1  is capable of working.[11]  The Court finds that this conclusion is supported by numerous doctor

2  reports provided within the Administrative Record.  *See Boyd*, 410 F.3d at 1179 (Under an abuse

3  of discretion standard, "a single persuasive medical opinion may constitute substantial evidence

4  upon which a plan administrator may rely in adjudicating a claim.")

5      Plaintiff underwent an FCE[12] on October 11, 2010, in which the evaluator concluded that

6  Plaintiff was capable of light duty work.  (*See* AR 12 (citing to the FCE, available at AR 800).)

7  Subsequently, Dr. Leonard, who specializes in Internal Medicine and Cardiology, performed an

8  independent medical examination ("IME") on May 2, 2011.  (AR 780–91.)  In his report, Dr.

9  Leonard concluded "[t]here is nothing about this problem of having solid food emptying

10  difficulties that would preclude this patient from having liquid breakfast, even liquid lunch, have

11  normal or slightly abnormal emptying of those liquids and be able to work a full workday."  (AR

12  789.)  This sentiment was echoed by Dr. Nudell on Januray 4, 2012, who concluded that Plaintiff

13  was capable of sedentary work due to her diabetic neropathy and recommended certain other

14  restrictions and limitations.  (AR 775–77.)

15      Plaintiff asserts that this Court should find that she is unable to work pursuant to the

16  SSA's 2008 determination that she is disabled.  (ECF No. 20 at 26–28.)  In response, CAFS

17  argues that the SSA's decision is based on a different standard than that of the Plan and further

18  contends that because the SSA decision was made in 2008 it no longer accurately reflects

19  Plaintiff's medical status and ability to work.  (ECF No. 25 at 14–15.)  Although the Court is

20  skeptical of CAFS's argument that the definition of disability under the SSA is distinguishable

21  from the Plan's definition, CAFS's argument as to the viability of the SSA's determination is well

22  taken.  The Court cannot disregard numerous recent medical opinions in light of a decision made

23  by the SSA in 2008.  *See Montour v. Hartford Life & Acc. Ins. Co.*, 588 F.3d 623, 635 (9th Cir.

24  2009) (holding that ERISA plan administrators are not bound by the SSA's determination).  As

25

26  [11]      As referenced in Section I(D) *supra*, Plaintiff was compensated for the first 18 month period of the Plan, which required Plaintiff to be unable to perform her own occupation.  Accordingly, the issue before this Court is whether Plaintiff is capable of performing any occupation.  Thus, for Plaintiff to be disabled under the Plan she "must

27  be unable to perform the work of any occupation for which [ ] she is or becomes reasonably qualified for by training, education or experience."  (AR 3 (section 2.05 of the Plan).)

28  [12]      As addressed within the section I(E) *supra*, an FCE is a functional capacity evaluation.

such, the Court finds that the record supports CAFS's determination that Plaintiff is not incapable of any occupation and thus not owed disability under the "Any Occupation" period.

## IV.    CONCLUSION

For the foregoing reasons, the Court hereby DENIES Plaintiff's Motion for Summary Judgment (ECF No. 20) and GRANTS Defendant's Cross-Motion for Judgment Pursuant to Rule 52 (ECF No. 21.)  The Clerk of the Court is hereby directed to close this case.

**IT IS SO ORDERED.**

Dated: September 30, 2014

Troy L. Nunley
United States District Judge

16